[No. 24721. Department Two. January 11, 1934.]

ERLE J. BARNES, *as State Director of Agriculture,*
*Respondent,* v. PAUL PATRICK *et al., Respondents,*
FEDERAL RESERVE BANK OF SAN FRANCISCO
*et al., Appellants.*[1]

[1]Reported in 28 P. (2d) 293.

*Weaver & Weaver,* for appellant Federal Reserve Bank of San Francisco.

*W. O. Miller,* for appellants Saunders *et al.*

*E. W. Schwellenbach,* for respondent Barnes.

*Crollard & O'Connor,* for respondent Bennett.

*Henry R. Newton,* for respondent Federal Land Bank of Spokane.

*Parker W. Kimball,* for respondents Tucker *et al.*

BLAKE, J.—In 1932, the defendants, Paul Patrick and Myrtle Patrick, co-partners under the firm name of Fred Schwab Commission Company, were operating three grain warehouses under state licenses—one at Ephrata, one at Coulee, and one at Wheeler. On November 19, 1932, Erle J. Barnes, as director of agriculture, filed a complaint in the superior court of Grant county, alleging that the amount of grain in the three warehouses was less than the amount called for by outstanding warehouse receipts, and prayed for the appointment of a receiver to take charge of the property and affairs of the co-partnership. The Federal

Reserve Bank of San Francisco filed a complaint in intervention, alleging that it was the holder in due course of forty-two negotiable warehouse receipts issued by the Fred Schwab Commission Company, and also praying for the appointment of a receiver.

On December 8th, a receiver was appointed, with whom were filed some three hundred seventy-three claims. Most of these claims were by holders of receipts issued by the Fred Schwab Commission Company on account of grain actually, or ostensibly, deposited in the three warehouses. These receipts were of three kinds: (1) Official warehouse receipts furnished to the Fred Schwab Commission Company by the director of agriculture, pursuant to Rem. Rev. Stat., § 7000; (2) receipts (which we shall term "unofficial receipts") identical in form with the official receipts, but which Patrick had caused to be privately printed; and (3) receipts in the following form:

"...........Gross
...........Tare
...........Balance
...........Sax
...........Bulk
...........Balance

WAREHOUSE PURCHASE
Receipt No............
THE FRED SCHWAB
COMMISSION COMPANY
OF WASHINGTON
FRED SCHWAB COMMISSION COMPANY has this day received the delivery from............
............ pounds of ...........wheat bulk............
testing ............ pounds.

...........Net Wt.

Off
DRIVER ...........
On

The said FRED SCHWAB COMMISSION COMPANY hereby agrees to pay the seller the cash market value of the said wheat, upon demand and the surrender of this receipt.
THE FRED SCHWAB COMMISSION COMPANY
By............
Manager."

Claims for wheat under all three classes of receipts amounted to 22,686,390 pounds. Upon investigation, the receiver found that there was in the three warehouses, all told, only 5,471,859 pounds.

March 8, 1933, the receiver filed with the court what he called his "First General Report." This report deals with the rights of the various holders of warehouse receipts and depositors of grain to share in the grain that is left. Some farmers who had deposited grain laid claim to specific sacks of grain, which they asserted had been put in special piles and earmarked, as provided for in Rem. Rev. Stat., § 7000. There were some receipts outstanding for which no grain at all had ever been deposited in the warehouses.

The receiver recommended that the claims on such receipts be denied, and that all claims for grain in special piles be disallowed. He further recommended that the holders of all receipts, "official," "unofficial" and "warehouse purchase receipts," issued by each warehouse, be classed as one group, and that all share ratably in the grain in such warehouse.

Pursuant to order of court, a day was fixed for hearing on the report, and notice was given to claimants to appear and present such objections thereto as they might have. The court, on April 11th, after hearing evidence presented by the receiver and the claimants, entered an order which, so far as the questions raised on this appeal are concerned, approved the report—denying the claims to specially piled grain; denying the claims of holders of receipts for which no grain was deposited; and ordering the grain in each warehouse, or proceeds from the sale thereof, to be ratably distributed among the holders of all receipts issued by such warehouse.

Three separate appeals have been taken from the order so entered: (1) By the Federal Reserve Bank;

(2) by Saunders and nine others, who made claims to specially piled grain; and (3) by Sieler, who made claim for specially piled rye, and also made claim under two negotiable receipts which were issued to him and for which no grain was ever deposited. We shall discuss these appeals in order.

I. Federal Reserve Bank claimed under forty-two negotiable receipts calling for 5,785,921 pounds of wheat. By its order, the court allowed, all told, claims under negotiable receipts for 9,395,421 pounds, and under "warehouse purchase receipts" for 5,169,649 pounds. There was available for distribution approximately 5,000,000 pounds.

It is the contention of the bank that the transactions between the commission company and the holders of "warehouse purchase receipts" constituted a contract of sale and not a bailment, and therefore the holders of such receipts are not entitled to share in the remaining grain. The argument presented in support of this position may be divided into three parts: (a) That the "warehouse purchase receipt" is, on its face, a contract of sale; (b) that, if not, the evidence discloses that the transaction under which such receipts were issued was intended as a sale and not a bailment; (c) that such receipts are not authorized by law and must yield precedence to negotiable warehouse receipts which are authorized by law.

(a) (b) Counsel for the bank cite a number of cases as tending to support the first two propositions, among which are the following: *Stewart, Gwynne & Co. v. Phoenix Insurance Co.*, 77 Tenn. 104; *Finch v. McClellan*, 77 Ind. App. 533, 130 N. E. 13, 131 N. E. 236; *Norton v. Woodruff*, 2 N. Y. 153; *Savage v. Salem Mills Co.*, 48 Ore. 1, 85 Pac. 69; *Morse v. LaCrosse Milling, Grain & Ice Co.*, 116 Kan. 697, 229 Pac. 366; *Carlisle v. Wallace*, 12 Ind. 252, 74 Am. Dec. 207;

*Chase v. Washburn,* 1 Ohio St. 244; *Barnes v. McCrea,* 75 Iowa 267, 39 N. W. 392, 9 Am. St. 473; *Cloke v. Shafroth,* 137 Ill. 393, 27 N. E. 702, 31 Am. St. 375; *Kansas Flour Mills Co. v. Board of Commissioners,* 124 Kan. 312, 259 Pac. 795, 54 A. L. R. 1164.

It is true that in the cited cases writings of more or less similarity to the receipts here under consideration were held to have constituted sales and not bailments. We think, however, the facts in all of these cases are clearly distinguishable from the facts in this case. In *Savage v. Salem Mills Co.,* 48 Ore. 1, 85 Pac. 69, a case upon which appellant places much reliance, the court says:

"It is manifest, therefore, that the load checks and receipts do not alone express the contract. They are but part of the transaction. Their importance is only made apparent upon proof of the custom and usual course of business of the defendant, known and acquiesced in by the depositors, and the purpose for which they were issued. The entire contract between the defendant and the persons delivering wheat to it was not embodied in the written memoranda, and it is not from a consideration of the writings alone that we are to determine the character of the transaction or the respective rights and obligations of the parties. The entire contract must be ascertained from the custom and usage of the business and the general understanding of the parties in connection with such load checks and receipts. . . .

"Upon this state of facts, the question for decision is whether the transaction between the plaintiff and his assignors and the defendant constituted a bailment or a sale. If the former, the title remained with the bailors and the loss must fall upon them, but if the latter, the title passed to the defendant at the time of the delivery, and thereafter the grain was held at its risk. It is often difficult to determine whether a particular transaction is a sale or a bailment, and especially so when it involves grain delivered to a person

and by him mixed and mingled in a common mass with grain belonging to himself or other parties.''

Now, taking the ''warehouse purchase receipt'' by its four corners, what is it? It is, first, a scale weight; second, an acknowledgment by the commission company of receipt of that amount of a certain kind of wheat; third, an offer by the commission company to buy the wheat. There is no offer to sell on the part of the depositor of the wheat. Nor is there any intimation in the receipt of an acceptance by him of the commission company's offer. The receipt, on its face, could ripen into a contract of sale only by acceptance, on the part of the depositor of the wheat, in accordance with its terms, namely, by calling on the commission company for payment of the market price on a given day and by surrendering the receipt. See *Swartswood v. Naslin,* 57 Wash. 287, 106 Pac. 770. We think the ''warehouse purchase receipt'' cannot be considered a contract of sale, complete in itself.

■  Under the rule of *Savage v. Salem Mills Co., supra,* parol evidence was competent to show what the transaction evidenced by such receipt actually was.

■  Coming, then, to the custom and manner of dealing of the commission company with depositors of grain, we find the following situation: Patrick was president of the First National Bank of Ephrata, as well as the guiding spirit of Fred Schwab Commission Company. Acting in the latter capacity, he loaned money to the farmers before harvest, taking their notes. When the farmers delivered their grain to the warehouses, he would not give them negotiable receipts, ostensibly because then he could not be protected in his loans to them. But he would take the ''warehouse purchase receipts'' as collateral for the loans and discount the farmers' notes, with the collateral, to the

First National Bank of Ephrata. When the latter needed money, he would issue negotiable receipts to the farmers, get their endorsements, and then discount the farmers' notes, secured by the negotiable receipts, to the Federal Reserve Bank.

Claiming under negotiable receipts issued in this manner, the bank seeks to exclude holders of "warehouse purchase receipts" from a *pro rata* participation in the distribution of the remaining grain. It seems to us that the bank's position presents something of an anomaly. The negotiable receipt under which the bank now claims was issued upon the theory that the maker of the note for which the receipt is security was the owner of the grain. If the "warehouse purchase receipt" constituted a sale, then whose grain does the negotiable receipt, issued to the farmer in place of the "warehouse purchase receipt," and now held by the bank, represent? In other words, the negotiable receipt now held by the bank can be genuine only on the theory that the maker of the note was at all times the owner of the wheat. We are convinced that the transactions under which the "warehouse purchase receipts" were issued were bailments, and not sales.

(c) The contention that there is no authority in the law for the issuance of "warehouse purchase receipts," and consequently the rights of holders of such receipts are subordinate to the rights of holders of negotiable receipts, is, we think, unsound. It is true the law specifies the kind of receipt which shall be issued. Rem. Rev. Stat., § 7000. The act does not, however, penalize a depositor of grain with loss of his property if he fails to demand and receive a negotiable receipt. The "warehouse purchase receipt" is not void by reason of the fact that it does not comply with the provisions of Rem. Rev. Stat., § 7000. *Manufac-*

*turers' Mercantile Co. v. Monarch Refrigerating Co.,* 266 Ill. 584, 107 N. E. 885. The fact that it is not negotiable and does not conform to the provisions of the statute, does not deprive one accepting it of title to his property.

II. Saunders and his co-appellants were farmers who deposited grain in the Wheeler warehouse, taking "warehouse purchase receipts." We do not think it is necessary to discuss their contentions separately, although their positions are not identical in all respects. We shall endeavor, however, to make our discussion, in a general way, broad enough to cover the contentions of all of them.

First, it is contended that the court had no jurisdiction to dispose of grain deposited in the warehouses through a receivership of the Fred Schwab Commission Company; that the court had no authority to charge the receiver's expenses against the property of appellants; that the distribution of the grain should have been carried out by the director of agriculture, pursuant to Rem. Rev. Stat., § 7000-1; that, in any event, the receiver should have brought an action in interpleader, in which summons should have been issued to the various holders of receipts.

No authority has been cited in support of these contentions. We do not find anything in Rem. Rev. Stat., § 7000, that prevents the director of agriculture from invoking the aid of a court of equity in such situations as he was confronted with here. Nor do we see any reason why a court of equity cannot, by notice or citation, require all persons laying claim to property found in the possession of an insolvent warehouseman, and over which the court has acquired jurisdiction by the appointment of a receiver, to come into court and establish their rights. So far as the receiver's expenses and compensation are concerned, allowance was

made only for such expense and compensation as was incurred and earned in determining the rights of the holders of the warehouse receipts. These charges were properly allowed.

These appellants also claimed specific grain in "special piles." They had borrowed money from the commission company; had given notes, secured by "warehouse purchase receipts" as collateral, which had been discounted with the First National Bank. When the insolvency of the commission company became known, Sieler, the manager of the Wheeler warehouse, undertook to protect these appellants and others similarly situated. To this end, on November 15th, he undertook to "sell" a sufficient quantity of wheat to offset the amount of their indebtedness to the commission company, and issued to them negotiable warehouse receipts for the balance of their wheat. In these receipts, an attempt was made to designate "special piles," pursuant to Rem. Rev. Stat., § 7000. If this procedure was not a wholly abortive attempt to comply with the "special pile" provision of the section, we think, nevertheless, that the evidence was insufficient to establish the identity of such "special piles" as belonging to appellants.

In this attempt to protect the appellants and others, Sieler, in some instances, procured from Patrick notes executed by appellants evidencing such indebtedness, and returned them to the makers. In other instances, where the notes had been discounted by the commission company, he procured receipts from Patrick, acknowledging payment of the notes, which he delivered to the makers. Appellants contend that, in the latter instances, the receiver should be required to take up the notes by paying the holders thereof from the proceeds of the sale of the grain. This position is obviously

untenable, in that it would give appellants a preference over the other receipt holders.

III. Appellant Sieler laid claim to a "special pile" of rye. There was no evidence offered by Sieler in support of the claim. The court did not allow it, apparently believing the evidence was insufficient to support it. With this conclusion, we agree.

■ Sieler also laid claim to 258,000 pounds of wheat for which admittedly no grain was delivered to the warehouse. The receipt was issued to secure him on loans of money and credit made to Patrick for the benefit of the commission company. While as against the commission company this receipt might be good, as against the real owners of the wheat it establishes no right. *Whitney v. Wenman,* 140 Fed. 959. The same may be said of his claim for 68,380 pounds of wheat claimed under two negotiable receipts, but for which no wheat was delivered to the warehouse.

The order appealed from is, in all respects, affirmed.

BEALS, C. J., TOLMAN, HOLCOMB, and GERAGHTY, JJ., concur.