THE STATE v. THOMAS H. EDWARDS, Appellant.—137 S. W. (2d) 447.

Division Two, February 21, 1940.

*Jno. D. Taylor* for appellant.

*Roy McKittrick,* Attorney General, and *Olliver W. Nolen,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted in the Circuit Court of Chariton County of embezzling 3,353 bushels and 25 pounds of wheat valued at \$3051.63, the property of Luke V. Moulder. The jury assessed his punishment at two years' imprisonment in the penitentiary, and on a paper separate from the verdict unanimously recommended a parole or clemency. The grounds for reversal urged on this appeal, among others, are: (1) that the trial court erred in overruling appellant's motion to quash, which alleged the information failed to charge any offense under the statute, Section 4079, Revised Statutes 1929 (Mo. Stat. Ann., p. 2880); (2) that the court erred in overruling appellant's demurrer to the evidence.

Embezzlement is purely a statutory offense, and did not exist at common law. [18 Am. Jur., sec. 2, p. 571; 20 C. J., sec. 2, p. 408.] The statute here invoked contemplates the commission of the crime by persons in various capacities. It states in the disjunctive: ''If any agent, clerk, apprentice, servant *or* collector of any private person, *or* of any co-partnership, except persons so employed under the age of sixteen years, *or* if any officer, agent, clerk, servant *or* collector of any incorporated company, *or* any person employed in any such capacity,'' (italics ours) shall commit the embezzlement, etc.

Summarized, the information charges:

(1) that the appellant was the president and principal stockholder of the Model Mill Company of Salisbury, Missouri, a corporation engaged generally in the business of a public warehouse and receiving and selling grain on commission; and that the appellant was the active manager of said mill and in complete control of its business affairs;

(2) that between June 25 and July 15, 1934, the Mill Company, acting through the appellant, received from Moulder the wheat aforesaid under an oral contract between the Mill Company, acting through the appellant, and Moulder, to store the same for a consideration of one-half cent per month per bushel for every month after the first thirty days said wheat was stored in said mill, and to hold said wheat in storage subject to the order of sale of Moulder, or to what(ever) other order Moulder might make concerning the disposition of said wheat;

(3) that the Mill Company, and the appellant as president, principal stockholder and active manager of said company, were "by the contract aforesaid then and there constituted and made the agents" of Moulder for the purpose of attending to the storage of said wheat according to said contract; that the wheat then and there came into the custody and possession of the Mill Company and the appellant, as president, principal stockholder, and active manager, by virtue of the agency and employment of the Mill Company and the appellant, as president, principal stockholder and active manager thereof, as aforesaid; the appellant being at all said times a person above the age of sixteen years;

(4) that thereafter and prior to January 9, 1936, said wheat, owned by Moulder, was willfully, fraudulently and feloniously embezzled and converted by the appellant to his own use "without the assent of his master and principal," Moulder.

Appellant's first assignment, that the information failed to charge any offense under the statute, in part is a charge of duplicity. As already stated, the statute mentions among others these two capacities in which a defendant may commit the embezzlement: (1) as the agent or employee of any private person, except when under the age of sixteen years; (2) as the officer, agent or employee of any incorporated company. Appellant contends the information charges in one count that he committed the embezzlement in *both* said capacities. Rereading, it will be seen paragraph 1 thereof does charge the appellant was the president, principal stockholder and active manager of the Mill Company, a corporation. Paragraphs 2 and 3 say the Mill Company, acting through the appellant, received Moulder's wheat under a contract. Paragraph 3 asserts that *both* the Mill Company and the appellant as its president, stockholder and active manager, were by said contract constituted and made the agents of Moulder; and that the appellant was over sixteen years old. Paragraph 4 charges he committed the embezzlement without the assent of his master and principal, Moulder.

All this may appear to bear out appellant's contention that the information charges appellant committed the embezzlement both as the agent of Moulder and also as the manager of the Mill Company, a corporation. But even so, that fact would not make it bad if the

two charges are consistent. [State v. Shelby, 333 Mo. 1036, 1045, 64 S. W. (2d) 269, 272; State v. Flynn, 258 Mo. 211, 221, 167 S. W. 516, 519.] However, we think the information does not make any such double charge. While it alleges the appellant sustained the dual relation of officer and manager of the Mill Company, and agent of Moulder, yet it does not say he committed the embezzlement in both capacities. On the contrary the charge is that he committed the embezzlement "without the assent of his master and principal," Moulder, thus discarding that far the previously alleged fact that he was also officer and agent of the Mill Company.

Nevertheless, we cannot reject this latter allegation as surplusage, since the theory of the information is that appellant individually became the agent of Moulder *because* he represented the Mill Company in making its contract with Moulder for the storage of the wheat. This is not a sufficient allegation of appellant's agency for Moulder—or rather, it pleads too much. When an officer of a corporation makes a contract with a third party whereby the corporation is constituted the agent of the latter, it is not the law that the officer thereby personally becomes the agent of the third party. Agency rests on the intention, the mutual understanding, of the parties, express or implied. [2 C. J. S., sec. 17, p. 1041 et seq.; 2 Am. Jur., sec. 23, p. 25.] If the appellant was the agent for Moulder, he represented *both* adversary parties, Moulder and the Mill Company. And it is well established that such a dual agency cannot exist without the knowledge and consent of both parties. [14a C. J., sec. 2225, p. 365; sec. 520, p. 838; 3 C. J. S., sec. 141, p. 15.] The information does not allege there was any agreement or understanding between appellant and Moulder that the former should represent the latter. It does not allege appellant committed the embezzlement in his capacity as officer of the Mill Company. For these reasons we think it was fatally defective.

As to the second assignment, that the State failed to make a case for the jury under the statute. It will be remembered the second paragraph of the information, summarized above, charges the contract between Moulder and the Mill Company provided the latter should *store* the former's wheat for a consideration payable monthly, holding it subject to Moulder's order of sale, or any other order he might make. In other words the Mill Company was to be a bailee, the title to the wheat remaining in Moulder. Appellant's contention is that under the contract proven the title passed to the Mill Company. If this was true, of course there could be no embezzlement of the wheat by the Mill Company, its owner.

The witnesses on both sides agreed this far: that the contract between Moulder and appellant, made in July, 1934, provided the Model mill would furnish the trucks and haul Moulder's wheat from his farm to the elevator, receiving for that service two cents per bushel;

that the wheat would be "stored" in the elevator for one-half cent per month per bushel; that when Moulder ordered the wheat sold the Mill Company would settle with him at the market price less fifteen cents per bushel as a handling charge. It is also undisputed that the contract did not require the wheat to be kept separate from other wheat in the elevator, but permitted it to be mixed with other wheat of the same year and grade, so that its identity would be lost. This was done. Moulder never ordered the wheat sold. Nevertheless the Mill Company, acting through appellant, did sell the wheat and other wheat. The proceeds were deposited to its credit in the Trader's Bank of Salisbury and the bank failed. (The State contends these facts are irrelevant and immaterial.) The Mill Company ceased operations in January, 1936, and went into bankruptcy. Moulder got about $196 and 150 pounds of flour out of his wheat.

Appellant made an offer of proof (which was excluded by the court but without the point's being saved in the appellant's motion for new trial) that the word "storage charge" as used in the contract is a technical term employed by operators of elevators where there is a present delivery of grain with a future settlement date at the seller's option; that it is a charge solely for the seller's privilege of extending and fixing the date of settlement, and does not signify the grain is to be held in storage as the seller's property. In this connection, appellant also presented evidence that grain produced one year is not mixed with that of a succeeding year, and is not ordinarily carried over past the time when the next year's crop comes in, since such a practice would put it in the power of the elevator's customers to protract the storage period indefinitely and thereby tax its facilities. The following admissions of the prosecuting witness Moulder on cross-examination are stressed by appellant (Moulder's son made a similar admission, and like testimony was given by the State's witness Phelps on cross-examination):

"Q. Now, then, Mr. Moulder, you made no reservation in that contract that you could go to the mill at any time you saw fit and take your wheat away from there, did you? A. No, sir; never had no contract like that.

"Q. And you never made any contract that you could take a like amount of wheat of the same grade away from there, did you? A. I never wanted to take any away.

"Q. All that you wanted was that when you thought the market was right you wanted money for what wheat was worth, didn't you? A. Yes, sir, that's right, I wanted it, but I didn't get it.

"Q. And that's all you are complaining about now, isn't it? A. Yes, sir; I didn't get it."

To the contrary the prosecuting witness Moulder and his son testified he declined to accept the written contract first submitted by appellant because it gave the mill the privilege of grinding the wheat, and he wanted the wheat to remain his own. He and the son further

stated he had a conversation with appellant in about December, 1935, in which he asked the latter's advice as to when the wheat should be sold, and appellant advised him to wait for a higher market, at the same time declaring the wheat was still in the elevator and had to be "turned" every thirty days. Appellant in that conversation complained that the storage charge of one-half cent per month per bushel allowed by the contract did not pay for handling the wheat. In January, 1936, just after the Mill Company ceased operations, when the witness asked appellant what had been done with his wheat, appellant replied "the bank made me sell it;" and in answer to the witness' objection that the bank had no right to make such a requirement, appellant rejoined: "In a way they did, and in a way they didn't." He further declared he "didn't have a bushel of wheat or a nickel in money." Moulder and his son said appellant spoke in the first person in making the contract and they thought he was dealing for himself because he "owned" the elevator.

This is enough of the evidence to give a perspective of the case. Appellant contends it shows a sale of the wheat to the Mill Company and not a bailment, because, under the admission of Moulder (and his son) the contract did not require the Mill Company to return to him the wheat which was the subject of the contract, either in the same or altered form. On this point the appellant cites Potter v. Mt. Vernon Roller Mill Co., 101 Mo. App. 581, 584, 73 S. W. 1005, 1006, and 6 C. J., sec. 4, p. 1086.

The Potter case holds that where a warehouseman receives wheat for deposit, to be mingled in a common granary with similar wheat belonging to the warehouseman or other depositors, or both, such other grain being added from day to day and sales being made from the common mass from time to time, the contract is a bailment and not a sale if the warehouseman is required to keep constantly on hand a sufficient supply of the grain to meet the calls of all such depositors. But where there is no obligation to return the specific wheat deposited, or the same amount of like quality, and the warehouseman is free to return another thing of value, such as flour instead of wheat, it is a sale, not a bailment.

Contrary to the holding in the Potter case, the cited section of 6 Corpus Juris at page 1086 declares the test of a bailment is whether an obligation exists to restore the thing delivered in the same *or altered* form; if so it is a bailment, not a sale. But even where there is no unconditional requirement that the thing delivered be restored, the transaction may sometimes be a bailment; as where goods are delivered by one person to another to sell, the title remaining in the deliverer and the deliveree being liable only: (1) to return the goods if not sold; (2) or, if sold, to account for the sale proceeds and not to pay a price. [6 C. J., sec. 7, p. 1091.] If, however, the person receiving the goods assumes an obligation to pay a designated

936

sum as the purchase price, to become due upon sale of the property, it has been said the transaction is a sale, not a bailment. [6 Am. Jur., sec. 39, p. 171.]

In the instant case the prosecuting witness, Moulder, reserved the option to say upon what present or future day's market the wheat should be valued, but not an option to demand the return of the wheat at his pleasure. Perhaps he could have demanded that only in case the Mill Company breached the contract by refusing to accept his order of sale. The contract proven is peculiar. The Mill Company had no option at all and there was no time limit. Under the contract when Moulder gave the order to sell, it was to *settle* with him at the designated market price less fifteen cents per bushel, thereby assuming the obligation to pay the amount due, not merely to account as agent for the proceeds of sale. There is an enlightening discussion of option contracts of this general character in Brown on Personal Property (1936), section 78, pages 259-263. [See also: State v. Rieger, 59 Minn. 151, 60 N. W. 1087; Barnes v. Patrick, 176 Wash. 142, 28 Pac. (2d) 293, 91 A. L. R. 901, note; 54 A. L. R. p. 1166, note.] Applying the logical rule there advocated to the facts of this case, the contract was a bailment until Moulder exercised his option of designating the market price—if up to that time the title to the wheat remained in him.

There is substantial evidence that it did. Moulder (and his son) testified he made the contract here involved and rejected another proposed by appellant, because the latter put the title to the wheat in the Mill Company. The fact that the contract entered into required Moulder to pay one-half cent per bushel storage on the wheat tends to show title remained in Moulder, Brown on Personal Property, supra, section 78, page 264. There is testimony that appellant complained the storage charge was inadequate because it did not cover the handling expense since the wheat had to be "turned" monthly. All this indicates a sufficient quantity of wheat had to be kept on hand to cover Moulder's deposit, according to appellant's construction of the contract. We cannot hold as a matter of law under this evidence that the title to the wheat passed to the Mill Company when it was placed in the mill.

■ A third assignment made by appellant is that the State failed to make a prima facie case because the evidence shows appellant did not, in any event, convert the wheat *to his own use*; but merely sold it in his capacity as officer and manager of the Mill Company, and turned over the proceeds to his employer the Mill Company. The statute, Section 4079 (Mo. Stat. Ann., p. 2880), does require that the agent, etc., "embezzle or convert to his own use." The information charges that he did that. Nevertheless, the rule is that "to make out a case of embezzlement, accused need not appropriate the property to his own use, but is guilty if he fraudulently appropriates it to the use of another." [20 C. J., sec. 16, p. 428-9.] More explicitly

it is said: "To appropriate 'to one's own use' does not necessarily mean to one's personal advantage. Every attempt by one person to dispose of the goods of another, without right, as if they were his own is a conversion to his own use." [18 Am. Jur., sec. 21, p. 581. See also Milbrath v. State, 138 Wis. 354, 120 N. W. 252, 131 Am. St. Rep. 1012; State v. Matkins, 326 Mo. 1072, 1080, 34 S. W. (2d) 1, 4(3); Goffe v. National Surety Co., 321 Mo. 140, 153, 9 S. W. (2d) 929, 934; State v. Meininger, 306 Mo. 675, 686, 268 S. W. 71, 75.]

The other assignments of error either are covered by what has been said or will not recur. For the defects in the information the judgment is reversed and the cause remanded. All concur.