**HARRY M. FINE REALTY COMPANY,**
Inc., a corporation, Plaintiff-
Appellant,

v.

**L. J. STIERS, Defendant-Respondent.**

No. 30214.

St. Louis Court of Appeals.

Missouri.

July 21, 1959.

Benjamin B. Tepper, Clayton, for appellant.

John J. McAtee, Clayton, for respondent.

BRADY, Commissioner.

In its action for breach of contract, appellant-plaintiff sought $4,344.86 as damages and now appeals from the judgment and findings of the trial court who heard the case without a jury and found for the defendant-respondent. Appellant-plaintiff's "assignments of error" can be considered as presenting two actual points. First, that under the law and the evidence the court should have found for the appellant-plaintiff and second, that the court erred in the exclusion of competent, material and relevant evidence.

This court will review non-jury cases as suits in equity, give due regard to the trial court's opportunity to judge

credibility of witnesses and will not set aside the trial court's judgment unless it is clearly erroneous, but will make independent findings of fact and will reach its own conclusions on the weight of the evidence. Section 510.310 RSMo 1949, V.A. M.S.; Davidson v. Fisher, Mo.App., 258 S.W.2d 297. Our final duty is to affirm the judgment or enter or direct such judgment as justice requires. Browder v. Milla, Mo. App., 296 S.W.2d 502.

The pertinent testimony was that the appellant had acted as sales agent when the Wall Building, located on the Northwest corner of Vandeventer Avenue and Olive Street in St. Louis City was sold by respondent on August 1, 1948. As a consequence of the sale, a promissory note in the principal sum of $77,000 secured by a second deed of trust became jointly owned by appellant, respondent, one Callicott who actually sold the building for respondent while working for appellant and took an interest in the second deed of trust as his commission, and one Geffen, who was real estate agent for the purchasers of the Wall Building and took his interest in the second deed of trust as his commission, but who has no connection with appellant in any capacity. The interests of appellant, $12,000, of which amount Callicott's interest was $6,000, and of Geffen, $5,000, appeared by endorsement on the note. Respondent held this deed of trust in his possession but the payments were made to appellant, who sent them to respondent, who then sent to appellant, Callicott and Geffen a check for their respective shares of the interest payments made, they having agreed to take no principal payments until respondent was fully paid. In March, 1955, the respondent's interest was $32,-448.63, and the other parties' interests as above stated.

Callicott's testimony on direct examination was that he had discussed with respondent the sale of respondent's second deed of trust at various times after the original sale in 1948, and in January or early in February, 1955, respondent and Callicott were discussing entering business together: that Callicott was to see a Mr. Rabushka about the sale of the second deed of trust and did so, but respondent would not sell at the discount offered (15%); that after several other conversations, respondent agreed to sell at that figure of discount; that Callicott never informed respondent that appellant was the purchaser, because he never knew that appellant was; that appellant had merely told Callicott he could handle the deed of trust at that discount (15%); that prior to this time the best offer Callicott had ever had was at a 20% discount from Mr. Melvin Rabushka, that this offer was refused by respondent. Callicott further testified that he had agreed with appellant to sell his interest to appellant at a 15% discount; that Rabushka's offers of less than 20% discount were made after March 2, 1955, the date of Exhibit No. 2; that after the letter of March 2, 1955, he attempted to obtain the deed of trust from respondent but was unsuccessful; that on March 22, 1955, he and appellant's counsel went to respondent's office with the cashier's check but that respondent was not there; that respondent did not limit him to selling only to the Rabushka estate when he asked him to sell the second deed of trust for him. On cross-examination he stated that the check was never tendered to respondent personally; that he may have or may not have dictated the letter of March 2, 1955; that Rabushka later changed his offer of 20% discount to 15%, then to 12½%, and still later to 7½%, but that he never informed respondent of these changes since they occurred after the March 2, 1955 letter; that he never told respondent that the Rabushka estate was the purchaser of the second deed of trust, nor did he tell him that appellant was buying it; that his connection with appellant was that when he, Callicott, worked out a deal, he paid appellant a certain share of it, and when asked to do so by appellant, he would assist appellant in working out deals, but was not an employee of appellant and merely had desk space; that he received the full amount of his interest in the second

deed of trust without any discount; that he did not know the building had been sold until respondent told him.

Other testimony on behalf of appellant was given by the witness, Gable, who testified that he is the assistant cashier at the Mutual Bank and Trust Company and identified the cashier's check referred to by the witness Callicott and stated that it was made payable to respondent and that the remitter was Ben Kleg Realty Company. On cross-examination the witness testified that this check was never cashed or deposited by the respondent but was cancelled by the remitter on March 23, 1955.

Matthew Maloney, Escrow Officer, Title Insurance Corporation, offered testimony that respondent brought in the note and second deed of trust on March 22, 1955 and was paid in full, receiving $32,634.66, for which he gave receipt that day; that the property was sold and the full purchase price paid on March 18, 1955; that the title company was holding the second deed of trust in escrow in case any debts appeared against the estate of Hyman Rabushka, then in probate process, since the title to the property was subject to debts against the estate; that between March 23, and April 1, 1955, Geffen and appellant were paid in full for their interests; that his records do not show any notification of the holders of the first or second deeds of trust of the sale of this property although his company ordinarily notified holders of deeds of trust.

Other testimony on behalf of appellant was that offered by Harry M. Fine, President of appellant, who testified as to the interest of Geffen, Callicott and his company in the note and second deed of trust and how those interests were created and in what amounts as heretofore stated. He testified also as to the method of payment of interest to these three co-holders as previously stated; that he made an offer to respondent on the last day or two of February or the first day of March to purchase

this property; he identified the letter of March 2, 1955 from respondent; that after receiving this letter, he made arrangements to purchase the interests of Callicott and Geffen and then made further arrangements to sell the second deed of trust to Ben Kleg at a discount of 5%; that he received another letter from respondent on March 22, dated March 21, cancelling and repudiating his earlier letter to the witness, which he read into the record; that the figure of $27,470.66 was arrived at by deducting 15% discount from $32,448.63, the amount of respondent's interest in the note and deed of trust as of that date, giving credit for interest and adding on "interest from the date of the monthly payment to the 22nd of March, which amounted to $89.-32. And he had a cashier's check for $27,-470.66"; that he was unable to obtain the second deed of trust from respondent; that the property was sold and this deed of trust paid off about the 22nd or so of March; that the first he knew of the sale was on the 21st of March, when the title company told him of the sale and that they were going to pay off this deed of trust; that he had been in the real estate business for 33 or 34 years, and his firm was a member of the Real Estate Exchange; that he had no personal contact with respondent except in 1948 when his firm sold the Wall Building; that his firm was not managing the property for respondent in 1955 nor had it previously; that neither he nor any member of his firm had anything to do with the sale of this property in March of 1955; that Rabushka called him on March 16th, 17th, or 18th and wanted to know if he could buy the second deed of trust and that he had informed Rabushka that the deed of trust had already been sold; that Callicott was his (appellant's) agent for the purchase of the deed of trust from Mr. Stiers; that he got the cashier's check for tender after March 22, 1955, but had been trying to make arrangements to give him the money from March 13th on; and that he never was told of any offer to purchase at 7½% discount.

Upon appellant resting, respondent moved for dismissal on the ground that there was no proof of an executed contract, only an executory contract being proved, and that there was no proof of tender. This motion being overruled, respondent offered testimony by respondent, Melvin Rabushka, and respondent's secretary, Opal K. Catlett. Respondent's testimony was in agreement with what has been stated herein as to the amount of the interests of the appellant, Geffen and Callicott in the note and deed of trust and how those interests were created. He further testified that he and Callicott had been discussing entering business together and had discussed the sale of this deed of trust at 15% discount; that prior to March 2, 1955, he had a discussion with Callicott about the sale and told him he would sell only if all were taking the same discount, to which Callicott agreed; that he signed the letter of March 2 but that Callicott dictated it; that he wrote the letter of March 21st, and that on March 18, 1955, he talked to Callicott who told him the Probate Court had approved his letter of March 2, 1955 and that the Rabushka estate would pay for it the next day. On cross-examination respondent testified that he had not restricted the sale of the second deed of trust to the Rabushka estate; that when he signed the letter of March 2, he knew to whom it was addressed and what it contained; that he spoke to Rabushka on March 18th and that was when he learned the property was sold; that he waited until the 21st of March to write his second letter to appellant so that he could talk to Callicott; that he did not go to collect his money until he wrote his second letter to appellant and until then he never made any attempt to get his deed of trust from his safety deposit box; and that he had been paid in full. On redirect examination respondent stated that his conversation with Rabushka was the first indication he had that Rabushka was not the purchaser; that he never received any answer from appellant to his letter of March 2, 1955; that he was never paid anything for signing that letter and that no tender was ever made to him by any one.

The witness Rabushka testified that for a period of two or three weeks prior to February 28, 1955, he had had conversations with Callicott relative to the purchase of this second deed of trust and that two or three weeks prior to February 28, 1955, he offered to purchase at 15% discount; that prior to February 28, 1955, he offered to purchase at 7½% discount and so informed Callicott, who indicated that respondent would accept the offer; that he tried to call Callicott several times the day following his offer of 7½% and could not get him but finally reached Mr. Fine who told him that the deed of trust was no longer for sale, that the man found out the building was sold, but that he did not state what man found out, and that this conversation took place before the contract on the Wall Building had been signed. On cross-examination Rabushka stated that the first time he spoke to Callicott about the purchase of the second deed of trust was around the first of 1955, on the street, and that Callicott had not stated that he was representing appellant or respondent; that he then spoke to Callicott about the matter about one and a half months later, about the first week of February, when the Wall Building had been put on the market for sale; that he called Callicott on the telephone and told him he was seriously interested in purchasing the deed of trust and wanted to know the best deal Callicott could make for him; that Callicott told him he would contact respondent and let him know; that he had several telephone conversations with him in the following one and a half weeks about possible discounts; that the contract for sale of the Wall Building was signed February 28, 1955; that that offer was made by telephone and that none of his conversations with Callicott were conducted face to face except the first one; that the offer on the Wall Building was made on the 15th by the Mercantile Trust Company; that in

between the 15th and the 28th of February he made his offer of 7½%; that he did not then know the offer of sale of the Wall Building would be accepted; that his family had decided to sell the Wall Building regardless of whether they could obtain this second deed of trust or not; that he came up from 20% discount to 7½% because they had an offer they could accept and "it would be money in the bank"; that he knew Mr. Fine only casually. On redirect examination Rabushka testified that prior to March 18, Callicott never told him the building was sold. On recross-examination he testified that the sale of the Wall Building was to be held in confidence and that he told no one about it.

Plaintiff's Exhibit No. 2 reads as follows:

"FO 7–4271      Real Estate-Loans-Insurance
"L. J. Stiers, Inc.
"4903 Delmar Blvd.
"St. Louis 8, Mo.

"March 2, 1955

"Harry M. Fine Realty Company
807 Chestnut Street
St. Louis 1, Missouri
          "In Re: Wall Building
             Second Mortgage
"Gentlemen:

"Please be advised that I agree to dispose of my interest, in the above captioned mortgage, at a discount of 15%.

"My interest in the mortgage, after giving credit for payment that is due March 1, 1955, is approximately $32,-500.00.

"This agreement to sell said mortgage on the above terms is to become null and void after April 1, 1955.

        "Yours very truly,

        "/s/ L. J. Stiers
"LJS:oks     L. J. Stiers"

Plaintiff's Exhibit No. 3 is as follows:

"FO 7–4271      L. J. Stiers
          "4903 Delmar Blvd.
          "St. Louis 8, Mo.

          "March 21, 1955

"Registered—Return Receipt

"Harry M. Fine Realty Company
807–09 Chestnut Street
St. Louis 1, Missouri

"Att: Harry R. Callicott

"Gentlemen:

"This is a notice of cancellation and repudiation of my letter to you of March 2, 1955, in which I agreed to sell my interest in the mortgage on the Wall Building at a 15% discount, inasmuch as said letter of March 2, 1955 was obtained by misrepresentation.
        "Yours truly,

        "/s/ L. J. Stiers
"LJS:okc     L. J. Stiers"

The trial court did not make specific findings of fact, the record disclosing no request of counsel so to do, and found "The issues herein joined in favor of defendant and against the plaintiff."

At the trial and in brief and argument on appeal, counsel in this case proceeded upon contractual theories. The appellant's theory of this case was that the letter of March 2, 1955, plaintiff's Exhibit No. 2, constituted respondent's written acceptance of appellant's offer to purchase, conveyed by his agent Callicott, thereby creating a bilateral contract. Respondent's theory was that the letter of March 2, 1955 was an offer to sell, and that since no consideration was paid for the offer, it could be withdrawn at any time prior to consummation, and that there was created an executory contract and not an executed contract. Respondent also urges that whatever contract was created was void, because of fraud.

We are of the opinion that the underlying and decisive question is one of agency. The evidence is that Callicott was agent for both appellant to buy and respondent to sell. The duality of his agency is admitted by appellant in its brief but appellant attempts to limit Callicott's agency for appellant, evidently under the theory that if Callicott was an agent generally for one party (respondent) yet his agency for appellant was limited, he was a "middleman" and therefore is not subject to the rule that an agent cannot act for both parties. The rule is, and has been, in this state since early in our reported cases, that one cannot act as agent for two parties whose interests are antagonistic, as with buyer and seller, unless both parties know of the agent's dual character and see fit, mutually, to trust him. Mercantile Mutual Ins. Co. v. Hope Ins. Co., 8 Mo. App. 408; DeSteiger v. Hollington, 17 Mo. App. 382; McClure v. Ullmann, 102 Mo. App. 697, 77 S.W. 325; Winter v. Carey, 127 Mo.App. 601, 106 S.W. 539; Crossley v. Summit Lumber Co., Mo.App., 187 S.W. 113; State v. Edwards, 345 Mo. 929, 137 S.W.2d 447; Peters v. Carroll, 153 Mo. App. 375, 134 S.W. 49; Shepley v. Green, Mo.App., 243 S.W.2d 772. See Story on Agency, 3rd Edition, § 31, p. 33; Mechem on Agency, Vol. 1, § 1189, p. 867, and Vol. 2, §§ 2138, 2139, p. 1715; 2 Am.Jur., Agency, § 262, p. 211; 3 C.J.S. Agency § 141, p. 15; Williston on Contracts, Vol. 5, § 1532, p. 4298. In the last cited work Williston gives the exception that:

"An exception to the above general rule has been laid down in some cases. It is universally admitted that if an agent or broker has any discretion, or if the principal is entitled to rely on him for his skill and judgment, it is fraudulent to act in a double capacity; but if an agent is employed merely as a broker or middleman for the purpose of bringing the parties together, has nothing to do with fixing the price or terms of the bargain in question, and has no adverse interests, he may act for both principals, and bargain for compensation from both."

Later in that same section, Williston states:

"The questions whether the agent can recover compensation and whether the contract is enforceable between the parties must receive the same answer, for where the agent is acting improperly for both parties the transaction may be rescinded on the application of either and he forfeits all compensation."

We think it obvious that Callicott's agency for appellant was much more than that which would make him a "middleman". See Harper v. Fidler, 105 Mo.App. 680, 78 S.W. 1034, for the Missouri rule as to "middlemen" in a similar factual situation.

We believe that the evidence would substantiate several findings by the trial court and that under any of them, appellant could not recover.

The trial court could have found that respondent knew that Callicott was acting for appellant as well as for himself. There is the evidence of their past dealings, and the fact that the letter of March 2, 1955 was directed to appellant to support such a finding. Under such a finding, Callicott had the same duty to act with fairness to each principal that an agent has in dealing with his principal on his own account. Restatement of the Law of Agency, § 392, Comment A, p. 215. That duty of fairness would require Callicott to inform respondent of the best price that could be obtained and all other matters which the respondent would think reasonably relevant. Restatement of the Law of Agency, § 390, Comment A, p. 209. This was not done if the court believed Rabushka's testimony. But the fact that both principals knew of their agent's double character does not, of itself, void the contract. There must be knowledge of all the material facts as well as knowledge of the agent's duality to make the contract binding. Nahn-Heberer Realty Co. v. Schrader, Mo.App., 89 S.W.2d 142. Moreover, although the courts

of this state as well as those of other jurisdictions have used the word "void" to characterize a contract wherein both parties were represented by the same agent, it is obvious that the correct term is "voidable" since those same courts go on to state that the contract may be affirmed. Of course, a "void" act could not be given expression by ratification. As pointed out in 48 A.L.R. at page 926, whether the language used is "void" or "voidable" should not matter where the facts of misrepresentation are interposed as a defense to an action on the contract as they are in this case, but only becomes important where it is contended by one seeking to enforce the contract that it was ratified by the other party. Atlee v. Fink, 75 Mo. 100. That *is not the contention of appellant here*. It is true that a party seeking to rescind for fraud or false representations must do so promptly and within a reasonable time, and the right is lost by failure to act in such a time on discovery of the fraud, or after it might have been discovered by the use of due diligence. 17 C.J.S. Contracts § 432, p. 914; 12 Am.Jur., §§ 446, 447, pp. 1027 to *1029; 24 Am.Jur., § 208, p. 32;* Restatement of the Law of Contracts, § 483. It follows then that even if the trial court found that respondent knew of Callicott's dual character, the contract was voidable by the respondent at his election, provided he acted within a reasonable time after the discovery of the misrepresentation. Respondent acted within three days of his discovery of the misrepresentation and notified appellant of his rescission and repudiation by his letter of March 22, 1955. Respondent's actions were made without unreasonable delay.

The trial court could have found that respondent did not know of his agent's dual character. Such a finding is supported by, and a reasonable inference from, the testimony of respondent explaining that the letter of March 2, 1955, was addressed to appellant as the result of Callicott's own wording of it and representations as to its necessity and the fact that it was at appellant's office that payments were made on the note and deed of trust.

In the case of McClure v. Ullmann, supra, Mrs. McClure brought an action for breach of contract when her husband sought to purchase a lot from Ullmann, title to be taken in plaintiff's name, after arranging with one Bradley to use his name as purchaser because Mr. McClure didn't think Ullmann would sell him a lot. Mr. McClure got Ullmann to name a price, stating he had a prospective purchaser (one Bradley) and upon the price being stated, gave Ullmann $25 as part payment and earnest money and took from him, in return, a receipt. Mr. McClure later tendered the balance of the purchase price and demanded a deed to plaintiff, the contract of sale and purchase having been assigned to her by Bradley. Ullmann refused to make the deed and Mrs. McClure sued for breach of contract. The trial court took the case from the jury on the ground that the evidence showed that Mr. McClure, the agent, perpetrated a fraud on defendant in acting as agent for both seller and purchaser, and for having a secret interest in the purchase. The court upheld action of the trial court, stating, 77 S.W. loc. cit. 326:

"The temptation to commit fraud is too great to permit one to act as agent for both buyer and seller. This dual relation, if unknown to the seller, makes the contract absolutely void, because against public policy." (Citing cases.)

In that case the answer was a general denial, but this court further held that where the illegality of a contract sued on appears from plaintiff's evidence, the defense may take advantage of it, even though he only pleaded a general denial. Compare Shepley v. Green, supra. At bar, the answer specifically pleaded fraud, and the letter of March 22, 1955 specifically referred to the "misrepresentation" which induced the letter of March 2, 1955. "Misrepresentation," Webster's New International Dictionary, Second Edition, tells us,

is "untrue, improper or unfaithful representation." To "misrepresent," that same source tells us, is to "Disserve or act counter to as a representative."

The case of DeSteiger v. Hollington, supra, is quoted extensively in the opinion in the McClure case. In the DeSteiger case the defendant executed a written contract to sell land. The evidence showed that the agent who procured his signature, one Beery, was also acting as agent for the purchaser although the defendant seller didn't know who the purchaser was. When the defendant seller discovered this, he refused to accept the balance of the purchase price or to execute and deliver a deed. The plaintiff purchaser sued for breach of contract. The trial court was reversed for refusal to give a requested instruction that unless the jury found that the defendant seller knew that the agent was acting for and in the interest of plaintiff purchaser, the contract would not bind the defendant seller. The court said, at page 388 of the report in 17 Mo.App.,

"We then have Beery acting as agent for both parties, his conduct, in this particular, giving evidence of the deep wisdom of the law in declaring such act fraudulent and of no effect. Agency or employment for two parties in antagonistic interests, is not a worthy position to occupy. It is not possible for a man to serve two masters, with opposing interests, honestly, at the same time; the rights of one, or the other, or both, will necessarily suffer."

In Huggins Cracker & Candy Co. v. People's Ins. Co., 41 Mo.App. 530, the court found that one McGibbons had acted as agent for both parties and such action made the contract "voidable". The court therein stated, loc.cit. 541:

"The law which commands what is right and prohibits what is wrong, we think, does not tolerate an agency of this kind. It has laid the rigorous hand of its iron interdict upon such an agency. For one successfully to ride two horses at the same time, going in opposite directions, is a feat in equestrianism remaining yet to be performed."

The court goes on to explain the basis for the rule by stating:

"The cases are nearly if not quite uniform, where the double employment exists and is not known. No recovery can be had against the party kept in ignorance, and the result is not made to turn on the presence or absence of designed duplicity and fraud, but is a consequence of established policy. * * The antagonism which exists between the opposite parties to a bargain is generally recognized by law. Each acts and has a right to act with a view to his own interest and they deal at arm's length. Accordingly if one acts by an agent that agent should be not nominally but really in place of the principal with his self interest undisturbed by calculations as to the interest of the opposing party. This, as well as the exercise of the best skill and judgment of his agent as to the contingencies of the bargain, the principal has the right to demand. Accordingly a contrivance which reduces the two parties to one and admits an agent representing antagonistic interests to make a bargain by himself is so far against the policy of the law that the contract is held void. * * * Such agreements are regarded as constructively fraudulent. * * * It is not necessary for a party seeking to avoid such a contract to show that any improper advantage has been gained over him; it is at his option to repudiate or affirm the contract, irrespective of any proof of actual fraud."

The rule in factual situations of the nature here involved is given by Williston in his work on Contracts in Vol. 5, § 1532, p. 4298, as follows:

"If a party enters into a contract through an agent who is also secretly acting for the other party, the contract is not only unenforceable specifically against the principal, (citing McElroy v. Maxwell, 101 Mo. 294, 14 S.W. 1;) but, unless ratified, is subject to a defense in any court on the ground of at least constructive fraud if the other party knew of the double employment, and, it seems, of mutual mistake, if neither principal knew of it. For like reasons, if the agent enters into arrangements with third persons without the knowledge of his principal which give the agent an interest inconsistent with his duty to the principal, the latter may avoid the transaction. Citing Landis v. Saxton, 89 Mo. 375, 1 S.W. 359."

In addition to the cases cited by the writer in the text work above see Neuman v. Friedman, 156 Mo.App. 142, 136 S.W. 251.

■ The evidence discloses yet another ground upon which the trial court is justified in its ruling. It cannot be denied that appellant knew of Callicott's agency for respondent. The Restatement of the Law of Agency, § 313, p. 52, reads:

"(1) A person who, knowing that the other party to a transaction has employed an agent to conduct a transaction for him, employs the agent on his own account in such transaction is subject to liability to the other party, unless he reasonably believes that the other party acquiesces in the double employment."

And Comment A, to that section reads at p. 53:

"The transaction is fraudulent with respect to the first principal and he is entitled to the remedies given for fraud. He can elect to rescind the transaction; or he can affirm it and recover from the other party the damage caused by the fraud, or, at his election, commissions or improper gratuities paid to the agent by the other party."

See Atlee v. Fink, supra.

As stated earlier herein, specific findings of facts were not requested and not made by the trial court and we therefore do not know upon what of the possible bases the trial court proceeded, but evidence abounds upon which the trial court could have found as it did. That being so, the trial court being in a better position to decide such questions of fact and credibility, we will not disturb its findings.

■ The appellant then urges that the trial court erred in excluding certain evidence upon objection by respondent. The evidence objected to and excluded was, appellant states, "pertinent to the proving of terms of and offer from appellant to respondent." Since we have assumed in this opinion, appellant's contention that there was an offer and that the letter of March 2, 1955, constituted an acceptance of that offer and have held that even with such an assumption of appellant's theory the judgment must be affirmed, the finding and judgment of the trial court being amply supported by the evidence on any one of several theories and not being clearly erroneous but in accord with the weight of the evidence as we view it, it is unnecessary to pass upon the point.

The Commissioner recommends that the judgment be affirmed.

PER CURIAM.

The foregoing opinion by BRADY, C., is adopted as the opinion of the court.

The judgment is, accordingly, affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.