322 So.2d 735

**Harold JONES**

**v.**

**STATE.**

**8 Div. 645.**

Court of Criminal Appeals of Alabama.

Aug. 19, 1975.

Rehearing Denied Oct. 1, 1975.

William J. Baxley, Atty. Gen. and David Dunn, Asst. Atty. Gen., for the State.

Bryce U. Graham, Tuscumbia, for appellant.

TYSON, Judge.

The four-count indictment charged the appellant in two counts with the grand larceny of eight cows, the personal property of Moulton Stockyards, Inc., or alternatively with the grand larceny of said cows, the personal property of Jack Owens. Counts three and four charged the appellant with obtaining the said eight cows by false pretense from Jack Owens, and alternatively from the said Moulton Stockyards, Inc.

No demurrer was interposed to this indictment. The jury brought in a general verdict of guilty as charged in the indictment, and then assessed the value of the property described in the indictment at $1906.00.[1] The appellant's motion for new trial challenging the weight and sufficiency of the evidence was overruled.

Jack Owens testified that he was the owner and operator of Moulton Stock-

---

1. The trial court set sentence at three years imprisonment in the penitentiary.

yards, Inc., in Moulton, Alabama. He said he knew the defendant, Harold Jones, and that he had been at the "Salesbarn" of Moulton Stockyards, Inc., bidding on cattle on September 14, 1973, and had been the highest bidder on eight head of cattle. Owens stated that all sales were for cash, and governmental regulations required that all cattle sold be paid for within seventy-two hours. Anyone seeking credit would have to have it authorized by him, and he did not extend any credit to Jones, nor did he authorize the delivery of the cattle to him before he paid for them. Owens said Jones had never paid him for the cattle in question, that he still owed the full purchase price of $1906.00.

On cross-examination, Owens stated that the cattle in question had been entered in the Stockyard's books under "Accounts Receivable," and that this was where sales that had not been paid were kept. Owens said Jones returned five or six weeks later to discuss the matter, at which time he told the appellant he had not paid for the cattle, but did not accuse him of stealing them. At this time, the appellant claimed that he had paid for the cattle. Owens stated that sometime after this meeting he swore out a warrant for Jones' arrest.

On redirect, Mr. Owens was shown a yellow "Purchaser's Release," listing the cattle in question. Across the bottom appeared the words, "Paid Cash, 9–14–73, Check cancelled," but Owens said this was not his handwriting, and he had not authorized anyone else to write it on there.

Diane Cameron testified that she was the daughter of Jack Owens, that she had worked at the Moulton Stockyards on September 14, 1973, as a clerk with the responsibility of taking in the money and checks for the payment of cattle sold each day and giving the customers their releases. She said that for each sale a "Purchaser's Release" was made out in quadruplicate, "a green copy for the veterinarian, a white one, which was kept on file in the office, a yellow copy for the purchaser, and a pink copy, which was sent to the barn as a load-out copy."

On September 14, 1973, Harold Jones came to the window where she was working and said that he wanted to pay for the cattle he had just bid on. Mrs. Cameron got his bill and added up the price. The appellant then asked her for a check, but it was on an out-of-town bank, and she did not have one. He said he had one out in the truck, so she tore apart the bill and gave him his yellow copy, thinking he would be right back, but he did not on that day, or any other day, pay for all, or any part, of the cattle by cash or check. Mrs. Cameron said some writing had been added to the bottom of the appellant's copy of the "Purchaser's Release," and the writing was not hers, nor did she recognize it as that of anyone else who worked in the office or "Salesbarn." She said if Harold Jones had paid her, she would have written "Paid Cash" on the top copy of the bill, and it would have appeared on all four sheets rather than just on the purchaser's copy.

On cross-examination, Mrs. Cameron stated that when the appellant came back several weeks later, he told her father that he had originally paid the account with a check, but after he received a call from the office notifying him that payment had not been received, he cancelled the check, returned to the office and said he paid cash.

John Moses testified that he worked at the "Salesbarn" at Moulton Stockyards. On September 15, 1973, he loaded the eight cattle in question for Harold Jones, or his brother, William Jones. Because of a close family resemblance between the brothers, Moses could not be sure which one. He said no one paid him any money at the time of the loading.

Braxton Craig testified that he was employed by Russellville Production Credit Association. On Friday, September 14, 1973, after the sale, he talked with the ap-

pellant, Harold Jones, and agreed to finance the purchase of eight cows.

Mike Sprinkle was also employed by Russellville Production Credit Association. He stated that the appellant came to his office on September 18, 1973, at which time loan papers were signed to finance the purchase of eight cows. Sprinkle gave Harold Jones a Russellville Production Credit Association check in the amount of $1906.00. Russellville Production Credit Association took a mortgage or lien on the cattle.

Jimmy Horton testified that he was a cashier with the Citizens Bank in Moulton, and that he was familiar with the appellant's account. During his testimony several bank ledger sheets, showing the status of this account, from August to December of 1973, were introduced into evidence. These records showed a balance of $145.00 in Jones' account on September 14, 1973, and a deposit of $1906.00 on September 18, 1973. The State also introduced a stop payment order filed by the appellant with the Citizens Bank on October 27, 1973, on a check made payable to Moulton Stockyards in the amount of $1906.00, and dated September 14, 1973. Horton stated that he had been unable to locate the check, which was the subject of the stop payment order. He also testified that a replacement check had not been issued. He also testified that the appellant had done his banking with him for the past four or five years.

The appellant's motion to exclude the State's evidence was overruled.

The appellant presented no evidence at trial. The motion for new trial was overruled, and also his request for the affirmative charge was denied by the trial court.

## I

The appellant contends that the trial court erred in overruling his motion to exclude the State's evidence, and then in denying his request for the affirmative charge, as well as in overruling his motion for new trial.

Larceny is the felonious taking and carrying away of the personal property of another with the intent on the part of the taker to convert it to his own use, or to deprive the owner thereof. *Higgs v. State,* 113 Ala. 36, 21 So. 353; *Moulden v. State,* 47 Ala.App. 573, 258 So.2d 915; *Armstrong v. State,* 49 Ala.App. 396, 272 So.2d 603.

In *Murchison v. State,* 32 Ala.App. 427, 26 So.2d 622, former Presiding Judge Carr observed:

"Confusion and difficulty sometimes arise in an effort to distinguish the three kindred crimes, larceny, false pretenses, and embezzlement. The Massachusetts Supreme Court in *Commonwealth v. Barry,* 124 Mass. 325, makes the distinction very clearly. Therein the court said:

" 'If a person honestly receives the possession of the goods, chattels or money of another upon any trust, express or implied, and, after receiving them, fraudulently converts them to his own use, he may be guilty of the crime of embezzlement, but cannot be of that of larceny, except as embezzlement is by statute made larceny. If the possession of such property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offence is that of obtaining property by false pretenses, provided the means by which they are acquired are such as, in law, are false pretenses. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely, and not with his title to the property, the offence is larceny.'

"The text writer in 35 C.J.S. False Pretenses § 3, p. 638, states the difference

between larceny and false pretenses to be:

" 'The crime of obtaining money or goods by false pretenses is closely allied, or analogous, to that of larceny, and it has been said that the statutes denouncing it and like offenses were designed for the fuller protection of personal property and in aid of the laws against larceny and theft. However, the two offenses are generally distinguishable, although the distinction is very fine where the obtaining of the money or property is accomplished by fraud, trick, or device. The distinction between the crimes of obtaining by false pretenses and larceny lies in the intention with which the owner parts with the property; if the owner, in parting with the property, intends to invest accused with the title as well as the possession, the latter has committed the crime of obtaining the property by false pretenses, but if the intention of the owner is to invest accused with the mere possession of the property, and the latter, with the requisite intent, receives it and converts it to his own use, the crime is larceny.'

"This court in *Reynolds v. State,* 31 Ala.App. 259, 15 So.2d 600, approved the rule of demarcation outlined above."

Moreover, in *McKinney v. State,* 12 Ala.App. 155, 68 So. 518, we find:

"It is true, as insisted by appellant, that in order to constitute a taking such as will support a charge of larceny, it must have been tortiously done—that is, it must be a trespass against the owner's possession, a taking without his consent (*Dozier v. State,* 130 Ala. 57, 30 So. 396) ; yet where his consent, or the consent of the person holding for him, is procured by means of fraud or a trick, practiced by the taker with the intent to steal, the taking is sufficient within the definition of larceny (18 Am. & Eng. Ency. Law [2d Ed.] 496, 473)."

■ In the case at bar, the requirement of a felonious taking is met when a person intending to steal another's personal property obtains possession of same although by or with the consent of the owner by means of fraud or through a fraudulent intent, trick, or device. *Murchison v. State,* 32 Ala.App. 427, 26 So.2d 622.

■ Thus, where, as here, the appellant secured the possession of the eight head of cattle with the apparent consent of the owner through the device of the appellant misrepresenting to Diane Cameron that he would return immediately with a check to pay for the cattle, by such fraudulent trick or device, the crime of larceny has been committed. *Illinois Automobile Insurance Exchange v. Southern Motor Sales Company,* 207 Ala. 265, 92 So. 429; *Reynolds v. State,* 31 Ala.App. 259, 15 So.2d 600, cert. den. 245 Ala. 47, 15 So.2d 605; *Hufstetler v. State,* 37 Ala.App. 71, 63 So.2d 730; *Sullivan v. State,* 43 Ala.App. 302, 189 So. 2d 593.

It is therefore clear, under the evidence in this cause, that the trial court correctly submitted this matter to the jury and denied the appellant's motions.

## II

■ Following the conclusion of the trial court's oral charge, we find the following:

"THE COURT: Well, I don't understand what your objections are.

"MR. GRAHAM: I just don't think it applies to the facts of this case, sir. I don't think the evidence in this case would support such a charge, sir. I don't think that—

"THE COURT: Such a charge as what?

"MR. GRAHAM: The charge that you gave as to trick.

"THE COURT: Well, which charge?

"MR. GRAHAM: The charge as to larceny by trick.

"THE COURT: Well, that's not a—in other words, that's just—larceny by trick, you don't even indict people by larceny by trick. They are just indicted for larceny, and the proof may show that that's the way it was.

"MR. GRAHAM: Well, I just want my objection sir.

"THE COURT: Well, that is what I was trying to understand. If I am wrong, then I could correct it.

"MR. GRAHAM: Well, my only objection is that there is no facts in this case that anything contained in the larceny is by trick except in the charge itself. And, on that basis, we except to the charge."

The exception as reserved above is not sufficient to invoke our review of the oral charge. As observed by Judge DeCarlo, speaking for a unanimous court, in *Garner v. State*, 53 Ala.App. 209, 298 So.2d 630, cert. den. 292 Ala. 721, 298 So.2d 633:

"... [W]e are compelled to follow that rule announced in innumerable decisions of our apppellate courts that, in order to put the court in error upon its oral charge, the reserved exception must designate and set out the particular part of the charge to which the exception is directed. *Brock v. State*, 28 Ala.App. 52, 178 So. 547; *Robinson v. State*, 38 Ala. App. 315, 82 So.2d 815; *Wilcutt v. State*, 41 Ala.App. 25, 123 So.2d 193."

Moreover, we have examined the oral charge wherein the court instructed the jury on the subject of larceny by trick and find that such instructions were proper. *Illinois Automobile Insurance Exchange v. Southern Motor Sales Company*, 207 Ala. 265, 92 So. 429; *Reynolds v. State*, 31 Ala.App. 259, 15 So.2d 600, cert. den. 245 Ala. 47, 15 So.2d 605.

III

The jury retired to deliberate at 4:42 p. m., and then returned to the courtroom at 6:20 p. m. for additional instructions in their request on certain definitions within the law. Following the giving of such instructions to which no exception was taken, the jury retired to deliberate further. Shortly thereafter, the jury then returned to the courtroom a second time to advise the court as follows:

"THE COURT: Ladies and gentlemen, have you been able to reach a verdict yet?

"THE FOREMAN: No, sir.

"THE COURT: Well, I don't want to get into speculating the evidence in the case, but I just want to tell you this: In my opinion you have enough evidence in this case to make a decision. Now, what your decision is ultimately has to be up to you and I don't want anybody to compromise any principles, but I do hope that you have discussed the case in the light of the charge that I gave you and applied the law to it as I gave it and as you found the facts to be. Now, there is not that much dispute in the facts. And, really, the State had requested that I give you the affirmative charge in the case, which would simply be this: That if you believe the evidence that the State offered to you, then there is sufficient evidence for you to act in the case. And really and truly what it boils down to, is whether or not you believe the evidence that has been offered to you, because the Defense didn't put on any evidence. The evidence is not in conflict that the State offered you, so it's a matter strictly of whether or not you believe it. Of course if you don't believe it, then you would have to return a verdict for the Defendant. And it stands on the other hand that if you did believe it, then you would have to return a verdict finding the Defendant guilty. So that is really the basis of where we are. Now, I sim-

ply mentioned that to you, not to comment on the evidence, but to comment that the only consideration really, that you would have here would be the credibility of the evidence that is offered to you, because as a matter of law I would be required if, in my opinion, the evidence was not sufficient, to take it away from you and never allow you to consider it, anyway. So, really, in essence what you are considering is whether or not the credibility of the testimony and the evidence that has been given to you, because the Defense did not offer any evidence in the matter.

"I am going to ask you to go back and to try to reach a decision for five minutes. And if you then report that you are deadlocked in five minutes, then I am just going to—I will have to discharge you. I won't have any choice in the matter, because you have been in there for quite a while. I just wanted to give you those last instructions. So I am going to ask you to please go back and just take one vote, or however you are doing it and, then if you are still crossed,—

"MR. GRAHAM: If it please the Court, I feel like that I must take an exception to the charge. Let the record show that we except to the statements—to the charge—that the Judge has just given to the jury.

"THE COURT: All right. Okay, you may return to the jury room."

The appellant asserts that the request of the court to consider the matter one further time constitutes reversible error.

 We do not agree. As noted in *Martin v. State*, 29 Ala.App. 395, 196 So. 753, it is never improper for the court to urge upon the jury the duty of trying to reach an agreement so long as the court does not suggest which way the verdict should be returned. Authorities cited.

As may be seen, the jury had only deliberated a short time before the above request was made of them. Under these circumstances, we feel that such was entirely proper. *Mac Swafford v. State*, 46 Ala. App. 187, 239 So.2d 329; *Poellnitz v. State*, 48 Ala.App. 196, 263 So.2d 181; *Martin v. State*, supra.

We have carefully examined this record and find same to be free from error. The judgment of the trial court is due to be and the same is hereby

Affirmed.

HARRIS, DeCARLO and BOOKOUT, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.

CATES, P. J., not sitting.