David McCord was separately indicted for four charges of theft in the first degree. The property involved in the indictments was (1) 932 bushels of soybeans belonging to William S. Lummus, Jr., and James H. Kirkland, Jr.; (2) 2382 bushels of corn and 10,071 bushels of soybeans belonging to Walton W. Rodgers; (3) 2454 bushels of soybeans belonging to Randall and Aubrey Hereford; and, (4) 2351 bushels of soybeans belonging to C.G. Cornelison. The alleged value of all the property totaled $111,922.77. The indictments were consolidated for trial and McCord was found guilty. Sentence was a five-year concurrent sentence on each indictment as well as restitution in the amount of the value of the property. On appeal, McCord argues that the State failed to present a prima facie case, failed to prove the value of the property named in the indictment, and introduced improper evidence of motive.
The defendant owned and operated McCord and Son Grain and Feed Company in Hollytree, Alabama. The victims named in the indictment were farmers who delivered soybeans and corn during the 1982 and 1983 crop years to the defendant's grain elevator under a "price later" agreement. Most of the testimony at trial centered upon the parties' understanding of the term "price later" as it applied to grain transactions.
The farmers testified that they understood the agreement to mean that the defendant would store their soybeans until *Page 522 
they were ready to sell them and, upon their direction, the defendant would sell the beans and pay them their money less a four cent per bushel per month storage fee. The defendant testified that a "price later" agreement meant that the grain company took title to the beans on the day they were brought to the elevator, but that the price of the beans was determined by the market price on the date that the farmer ordered the beans sold. He testified that although he charged the farmers a four cent per bushel per month fee, which was variously referred to as a "storage, service, or handling charge," he never agreed to physically store the beans until the farmers called for their money. Referring to the four cent charge, he testified that it was "something for your insurance and your handling of it and your paperwork." All parties agreed that, in effect, the "price later" arrangement allowed both the farmer and the elevator operator to gamble on the futures market, and to take their chances with the fluctuation of the price of soybeans.
When the farmers brought their crops to the defendant's elevator in the fall of 1983, the grain was weighed and graded and the farmers were given printed weight tickets in the following form: In Out J.D. McCord Son No. _________ [ ] Spot [ ] Grain Feed Co. [ ] Storage [ ] [ ] Contract [ ]
Day Phone Night Phone 776-2619 776-2838 Hollytree, Alabama Weigher __________ Date __________ Seller __________ Address __________ Driver on _________ off __________
Kind and Grade of Grain _______ Base price ________ per bu.
ALL GRAIN WILL BE SOLD ON DATE OF DELIVER UNLESS PRIOR ARRANGEMENTS ARE MADE.
Discounts
_____ lbs. gross Test Wt. __________ __________
_____ lbs. tare Moisture __________ __________
_____ lbs. net F.M. __________ __________
_____ less dkge. Splits __________ __________
Garlic __________ __________
Other __________ __________
Price Paid $ __________ __________
NOT NEGOTIABLE
In the space labelled "Seller," the name of the respective farmer who brought in his crop was noted. In the space for "Base price," the weight tickets were marked "Later," or "P.L.," for "price later." On some of the tickets the defendant made a handwritten notation of "Storage" in the space labelled "Other."
When the farmers told the defendant to sell their beans in the spring of 1984, he did not pay them or return their beans, and shortly thereafter he declared bankruptcy.
 THE EVIDENCE OF UNAUTHORIZED CONTROL
The defendant was indicted for first degree theft pursuant to § 13A-8-3(a), Code of Alabama 1975, which incorporates the following definition:
 "A person commits the crime of theft of property if he:
 (1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property. . . ." Ala. Code (1975), § 13A-8-2(1).
The indictments tracked this statutory language. The defendant was not indicted for theft by deception
under § 13A-8-2(2). Compare Swinney v. State,482 So.2d 1326 (Ala.Cr.App. 1985).
The defendant presents three arguments why the State failed to prove that he exercised "unauthorized control" over the beans. First, he maintains that under his version of the "price later" agreement, title to the crops passed to him at the time they were placed in his elevator and he was entitled to sell, transfer, or otherwise deal with the beans as his own. Therefore, he only exercised control over his own property. Second, he argues that, even if the farmers' version of the transaction is correct and he was not authorized to physically remove the beans from his elevator until they told him to sell, the State did not prove that he sold or removed the beansbefore the farmers gave the order to sell. Third, relying on § 13A-8-12, Code of Alabama 1975, he argues that the State did not *Page 523 
prove his "intent to deprive" the farmers of their property because of his "claim of right" or honest belief that he held title to the beans at the time of the alleged sales.
These three arguments are answered in Issues I, II, and V of this opinion. Issues III, IV, and VI address related questions in determining the sufficiency of the evidence.
 I
Whether title to the beans passed to the defendant at the time the beans were delivered was a question for the jury. Grain transactions similar to the one at issue here have been the subject of much civil litigation. Lapeyrouse GrainCorp. v. Tallant, 439 So.2d 105 (Ala. 1983); Criglerv. Salac, 438 So.2d 1375 (Ala. 1983); NYTCO Services,Inc. v. Wilson, 351 So.2d 875 (Ala. 1977); Annot., 108 A.L.R. 928 (1937); Annot., 91 A.L.R. 907 (1934); Annot., 54 A.L.R. 1166 (1928). The issue, which typically arises in a civil suit for conversion, is whether the deposit of grain was a bailment or a sale. Kipp v. Goffe Carkener,144 Kan. 95, 58 P.2d 102 (1936). Our research has uncovered only one criminal case dealing with the precise issue.
In State v. Edwards, 345 Mo. 929, 137 S.W.2d 447
(1940), a wheat farmer delivered his grain to the mill company under an agreement that the crop would be "stored" in the elevator for 1/2 cent per bushel per month. Then, when the farmer ordered the wheat sold the mill company was to settle with him at the market price. Against the mill owner's contention that the transaction constituted a sale and precluded his conviction for embezzlement, the Missouri Supreme Court characterized the contract as a bailment because it contemplated that "a sufficient quantity of wheat had to be kept on hand to cover [the farmer's] deposit." 137 S.W.2d at 451. See generally, Annot., 54 A.L.R. 1166, supra. However, because the case was reversed on other grounds, the court's discussion is of limited precedential value.
Although different courts have construed virtually identical agreements to be either bailments as a matter of law, Burkev. Boulder Milling Elevator Co., 77 Colo. 230,235 P. 574 (1925), or sales as a matter of law, Morse v. LaCrosseMill, Grain Ice Co., 116 Kan. 697, 229 P. 366 (1924), the Alabama Supreme Court has held that the issue presents a question of fact for the jury.
In NYTCO Services, Inc. v. Wilson, supra, farmers delivered their soybeans to Covington Grain Company under a "price to be agreed upon later" plan. They received weight tickets which contained both the terms "Bought of [the farmer]" and "Stored [by the farmer]." The court affirmed the denial of the grain company's motion for directed verdict, finding that "there was at least a scintilla of evidence that there was a bailment as to Covington Grain," 351 So.2d at 879. InLapeyrouse Grain Corp. v. Tallant, supra, farmers delivered their wheat to Montgomery Grain Corporation under an agreement designating the wheat as "unpriced," and received weight tickets stating that "upon delivery and acceptance, title passed to Lapeyrouse Grain Corp," 439 So.2d at 108. There was also evidence that the granary agreed to "store" the wheat and assessed a "storage or handling fee." The Alabama Supreme Court held:
 "Although the writing in NYTCO suggests a bailment and the writing in the case before us suggests a sale, NYTCO nevertheless found the writing to be only one factor in determining the intent of the parties. In neither NYTCO nor the instant case is the writing represented to be the final written expression of an agreement. The Alabama statute regarding open price term contracts for sale also makes it clear that the intent of the parties is paramount in determining whether a contract for sale has been concluded prior to the fixing of a price:
 " 'Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract.' Code 1975, § 7-2-305(4).
 "Thus, if the parties in this case intended not to be bound unless the farmers *Page 524 
were allowed to choose the date of sale, then the delivery was a bailment rather than a sale; thus, the farmers had standing to sue for conversion. The same authorities also indicate that the determination is properly for the jury. An Official Comment to the Uniform Commercial Code notes that whether the parties have intended a sale is 'in most cases a question to be determined by the trier of fact.' § 7-2-305, Official Comment 2.
"The NYTCO Court said:
 'Therefore the court was not in error in denying defendants' motion for directed verdict since there was at least a scintilla of evidence that there was a bailment as to Covington Grain.' NYTCO, at 879.
 "We find that the evidence of record concerning the storage agreement is sufficient to present a jury question as to whether the delivery was a bailment or a sale."
439 So.2d at 108-109. (Emphasis added.)
Under this authority, the issues of title to the beans and whether the transaction was a bailment or a sale, were jury questions. The defendant's motion for judgment of acquittal on this ground made at the close of the State's case was, therefore, properly denied.
 II
The defendant insists that even if the "price later" agreement is construed as a storage or bailment contract which did not entitle him to remove the soybeans from his elevator until the farmers specifically authorized the sales, the State did not prove that he sold the beans before the farmers directed him to do so. We agree with the defendant with respect to three of the four farmers named and find that the convictions for the theft of property belonging to Lummus, Hereford, and Cornelison must be reversed and judgment rendered for the defendant on those counts because of the State's failure to present proof of "unauthorized control."
William Sly Lummus, Jr., testified that he had been doing business with the defendant since 1977, that he took his 1983 soybean crop to the defendant's grain elevator, and that sometime later he asked the defendant to sell his beans. The defendant, however, was unable to pay him. From the record:
 "Q [By assistant attorney general]: Did either you or Mr. Kirkland, to your knowledge — your own personal knowledge — ever call the defendant over there and ask him to sell your beans?
 "A [By Lummus]: Not until about the middle of February. We did call about that time and ask him to sell the beans and give us the money.
"Q What was his response at that time?
 "A Well, his initial response was that he would do it. And then after that, we did not receive a check. We started checking back with him, and we found out as time progressed that he was apparently unable to pay us.
 "Q Did you ever find out whether your beans were there or not at that time?
"A No, we did not find out.
 "Q Was your testimony earlier that Mr. McCord over there told you that your beans were somewhere else?
 "A Yes. He told us that our beans were in storage at Central Soya in Chattanooga.
"Q They weren't there either; is that correct?
"A That is correct."
"[T]he mere failure to pay a balance found to be due, growing out of numerous transactions covering a period of two years, while furnishing a basis for a civil suit is not sufficiently definite to sustain a criminal charge." Hurst v.State, 21 Ala. App. 361, 363, 108 So. 398, 399 (1926). "Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform." Ala. Code 1975 §13A-8-1(1)(f). From aught that appears from the State's evidence, the defendant sold the soybeans upon Lummus's request but was, as Lummus said, "apparently unable to pay." Furthermore, the fact that *Page 525 
the defendant told Lummus that his "beans were in storage at Central Soya in Chattanooga" also does not establish "unauthorized control" over the Lummus crop, for Lummus testified that he did not expect his beans to be physically present in the defendant's facility at all times but understood that the defendant could "transfer" the beans:
 "A Yes, he had. Under the price-later plan, it was not my understanding that the beans were actually at his location, but it was my understanding that he either held sufficient beans or vouchers from the grain company or something to cover the value of those beans up until the time that we told him to sell.
"Q That your beans were accounted for?
 "A They were accounted for either by being in storage at his facility or at a grain company with whom he was doing business." (Emphasis added.)
On cross-examination by defense counsel, Lummus conceded:
 "[I]t's a fair statement to say that I did not know where they the soybeans] were physically, whether they were at his facility or someone else's even."
". . . .
 "Q I believe you previously testified that you knew that Mr. McCord could transfer the beans, and that he did transfer the beans to other granaries on occasions?
 "A Yes. In fact, he told us during this time period that the beans were at Central Soya; but yes, we knew they could be transferred."
In reviewing the sufficiency of evidence based on a motion for judgment of acquittal, we examine only that evidence which was before the trial court at the time the motion was made.See German v. State, 429 So.2d 1138, 1140 (Ala.Cr.App. 1982); Crane v. State, 401 So.2d 148, 150
(Ala.Cr.App.), cert. denied, 401 So.2d 151 (Ala. 1981);Kontos v. State, 363 So.2d 1025 (Ala.Cr.App. 1978);Tooson v. State, 56 Ala. App. 613, 615, 324 So.2d 327,329, cert. denied, 295 Ala. 426, 426, 324 So.2d 333 (1975).
Based upon Lummus's testimony, there is no evidence that the defendant sold the crops without authorization by Lummus. InSwinney, supra, this court dealt with a similar situation. There, a farmer deposited his soybeans for storage[1] with the accused and when he told the accused to sell, the accused "replied that his crops had already been sold and were gone." 482 So.2d at 1327. Although the conviction was reversed and judgment rendered because there was insufficient evidence of theft by deception, it was noted that the evidence was sufficient to show that the accused did exert "unauthorized control." In contrast, the defendant here did not tell Lummus that his crop had already been sold when Lummus directed him to sell. There is no other evidence in the State's case in chief which proved a sale before Lummus authorized one.
Although the defendant testified that, believing he had the right to do so, he sold all of the crops before the farmers ordered him to sell, this evidence may not be used to determine whether the State presented a prima facie case. "Testimony given after the State had rested its case and the motion to exclude been presented, cannot be used to support the verdict of the jury." Williams v. State, 340 So.2d 1144, 1145
(Ala.Cr.App.), cert. denied, 340 So.2d 1149 (Ala. 1977).
The testimonies of Hereford and Cornelison suffer the same deficiency as that of Lummus. There is simply no evidence that the defendant had already sold their crops when Hereford and Cornelison ordered the defendant to sell.
In contrast to the testimony of Lummus, Hereford, and Cornelison, which did not prove the defendant sold grain before the farmers authorized the sales, the testimony *Page 526 
of Walton Rodgers did establish a sale unauthorized by Rodgers. Rodgers stated that when he went to McCord's granary to sell his beans the defendant told him he could not pay.
 "Q [By assistant attorney general]: Then did you [Rodgers] ask for your beans after you couldn't get a check?
 "A Asked where the beans were and he said he sold them.
"Q Did he tell you when he had sold them?
 "A No; he never did. Says he burnt the tickets up or said the tickets got burned up."
 III
Thus, in only one of the four cases did the State prove that the defendant exercised "unauthorized control" over the soybeans. The State's theory at trial was apparently that the defendant's "unauthorized control" over the soybeans was proved not only by the testimony of the farmers themselves, but also by evidence that the defendant did not comply with certain statutory licensing and bonding requirements relating to grain dealers, and by evidence that he disposed of soybeans which the farmers had mortgaged to the Farmers Home Administration. In our judgment and for the following reasons, neither of these theories, even if proved, establishes "unauthorized control" for purposes of a criminal prosecution for theft of the farmers' soybeans.
The Alabama Grain Dealers Act requires any person operating a grain elevator and engaged in the business of buying or receiving grain from producers for resale or for storage to obtain a license and to file a surety bond with the State Commissioner of Agriculture and Industries. Ala. Code § 1975, §§ 2-31-3 and 2-31-4. The Act does not apply to "persons who buy for cash; that is, those who pay producers at the time of purchase in United States currency or check or their equivalent." § 2-31-2.
In its case in chief, the State introduced evidence, through the testimony of Carl D. Boyett, a field auditor with the State Agriculture Department, that on March 31, 1984, the defendant applied for an exemption from the licensing and bonding requirements of the Grain Dealers Act by certifying the following:
 "I hereby certify that payment for all my grain purchases made from producers will be made at the time of purchase and that such payment will be made by United States currency, check or their equivalent.
 "I further certify that I fully understand that before grain can be purchased by any means other than as specified above, I must be properly licensed and bonded as a grain dealer in accordance with the Grain Dealers Act No. 81-391-1981.
 "I further certify that I fully understand that I may not hold or store grain for others unless I am properly licensed and bonded as a warehouseman in accordance with Alabama State Warehouse Law 8-15-1 and 8-15-7.
Name of Business J.D. McCord Son
Feed Grain Co.
By: /s/ David McCord Sr.
Title: Owner
Date: 3-21-84"
(Emphasis in original.)
The defendant's claim of exemption from the Act based on his statement that he made only cash purchases of producers' grain was signed on March 21, 1984, after the delivery of all the crops at issue here. However, Boyett testified that as early as the summer of 1982 he visited the defendant's place of business, explained the provisions of the Act to the defendant, and was told at that time that the defendant made only cash purchases of grain. Although the State introduced no evidence of the fact that defendant did not subsequently obtain a bond or a license as required by statute, the defendant's statements to Boyett in the summer of 1982 and his claim of exemption signed in March 1984 provide circumstantial evidence of the fact that he was never licensed or bonded. *Page 527 
The fact that defendant had actual knowledge that unless he was licensed and bonded he was statutorily barred from accepting grain on any terms other than an immediate cash payment basis makes his dealing with the four farmers here on a "price later" basis statutorily "unauthorized." See Kippv. Goffe Carkener, supra (unlicensed and unbonded grain dealer not authorized to store grain); Summers v. PeoplesElevator Co., 136 S.W.2d 81 (Mo.App. 1939) (same).
While the defendant could not legally engage in "price later" transactions under the Grain Dealers Act, it is undisputed that the farmers themselves authorized the defendant to receive their soybeans on a "price later" basis. Control unauthorized by regulatory statute is not equivalent to control unauthorized by the owner of the property, and will not alone satisfy the State's burden of proving the element of "unauthorized control" in a theft case. Doyle v.State, 468 N.E.2d 528 (Ind.App. 1984).
In Doyle, the accused was the accountant for a school building organization which established a holding corporation to issue trust indentures. The accused bought out the other shareholders of the holding corporation, set himself up as president and sole stockholder of the corporation and then contracted with his own solely-owned accounting firm for services. After numerous large checks were issued from the holding corporation to the accounting firm, the accused was indicted for theft of property. The Indiana Court of Appeals reversed his conviction and rendered judgment for him, reasoning that the State had not proved "unauthorized control" over the corporation's property because the accused, as sole shareholder of the corporation, had obviously consented to the transfer of funds to the accounting firm. Against the State's contention that it had shown "unauthorized control" because the accused's acts violated the articles of incorporation of the holding company and violated several statutes relating to the duty of a fiduciary, the court held that "[s]uch acts, however, do not constitute an exercise of 'unauthorized control' as our legislature has defined it." 468 N.E.2d at 533. Section 35-43-4-1(b) of the Indiana Code, 1982, provided that control was unauthorized if it was exerted "(1) without the other person's consent [or] (2) in a manner or to an extent other than that to which the other person had consented."
Although our theft statute contains no definition of "unauthorized," it defines "owner" in § 13A-8-1(8) as "[a] person, other than the defendant, who has possession of or any other interest in the property involved, . . . and withoutwhose consent the defendant has no authority to exert control over the property." (Emphasis added.) Like the Indiana provision, our theft statute is based in part on the Model Penal Code, see Ala. Code § 13A-8-2 Commentary, which defines theft in terms of exercising "unlawful control" over the property of another. Model Penal Code and Commentaries § 223.2(2) (A.L.I. 1980). "The word 'unlawful' . . . implies the lack of consent or authority. . . ." Id. at 166. The Alabama legislature, in our judgment, intended to adopt the rationale of § 223.2(1) of the Model Penal Code in defining theft as the exertion of control unauthorized, or unconsented to, by the owner of the property. Section13A-8-1(7) provides the following:
 "OBTAINS OR EXERTS CONTROL OR OBTAINS OR EXERTS UNAUTHORIZED CONTROL over property includes but is not necessarily limited to the taking, carrying away or the sale, conveyance or transfer of title to, or interest in, or possession of, property, and includes but is not necessarily limited to conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, larceny by conversion, embezzlement, extortion or obtaining property by false pretenses."
Because the definition in § 13A-8-1(7) supra, incorporates many of the common law elements of larceny and larceny by trick, as well as false pretenses, and *Page 528 
embezzlement, it is evident that the legislature did not intend to abandon altogether the concepts of an owner's nonconsent, which was critical to a larceny prosecution, Eady v.State, 48 Ala. App. 726, 267 So.2d 516 (Ala.Cr.App. 1972), or consent obtained by fraud, which characterized larceny by trick, Jones v. State, 56 Ala. App. 444, 322 So.2d 735
(Ala.Cr.App.), cert. denied, 295 Ala. 408, 322 So.2d 741 (Ala. 1975), and false pretenses, Harrison v. State,465 So.2d 475 (Ala.Cr.App. 1984), or breach of trust which distinguished embezzlement, Adams v. State,43 Ala. App. 281, 189 So.2d 354 (Ala.App.), cert. denied, 280 Ala. 707, 191 So.2d 372 (Ala. 1966). Thus, we adopt the premise of the Model Penal Code § 223.2(1), and the reasoning of the Indiana Court of Appeals in Doyle v. State, supra, and conclude that our legislature intended that the control over property exercised by a defendant indicted under §13A-8-2(1) must be unauthorized by the owner of the property, as that term is defined in § 13A-8-1(8), and not merely unauthorized by statute, regulation, or other applicable norm.
At trial, the State introduced evidence through the testimony of Hulette Chambers, Madison County Supervisor for the Farmers Home Administration (FmHA) that the crops named in the Hereford and Rodgers indictments had been mortgaged to the FmHA, and that the FmHA notified the defendant of its security interest.
The defendant's sale of soybeans in which the FmHA held a security interest does not establish the element of "unauthorized control" here because the indictments did not charge him with the theft of property belonging to the FmHA. The indictments charged him with theft of property belonging to Hereford and Rodgers, respectively. Thus, any control unauthorized by the FmHA[2] is simply immaterial to the offense for which the defendant was indicted.
 IV
Because the cases involving Lummus, Hereford, and Cornelison must be reversed because of the State's failure to prove the element of "unauthorized control," we need consider the element of "intent to deprive" only as it relates to the remaining Rodgers indictment, for which sufficient evidence of "unauthorized control" was presented.
In a theft trial, intent is a question for the jury.McMurphy v. State, 455 So.2d 924, 928 (Ala.Cr.App. 1984); Craig v. State, 410 So.2d 449 (Ala.Cr.App. 1982). "Intent can only be shown by facts and circumstances from which the jury is authorized to draw the inference."Burk v. State, 22 Ala. App. 107, 108, 114 So. 71, cert. denied, 216 Ala. 655, 114 So. 72 (1927). "The scintilla rule does not apply in a criminal case." McArdle v. State,372 So.2d 897, 901 (Ala.Cr.App.), cert. denied, 372 So.2d 902
(Ala. 1979). "Intent, . . . being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances *Page 529 
as developed by the evidence." Pumphrey v. State,156 Ala. 103, 47 So. 156, 157 (1908).
The evidence from which the jury could infer that the defendant intended to deprive Rodgers of his property is found in the following evidence. (1) In the spring of 1984, when Rodgers told the defendant to sell his crops and the defendant replied that they had already been sold, the defendant stated that the sales tickets had been burned in a fire. (2) The defendant knew, in the fall of 1982 when he accepted Rodgers's crops on a price later basis, that he was prohibited by statute from engaging in such transactions without being licensed and bonded by the State. And, (3) the defendant had a motive to deprive Rodgers of the money for his crops, since the defendant had sustained financial losses in futures trading.
Although there is no direct evidence that the sales tickets for Rodgers's crops were, in fact, destroyed by fire or that, if a fire did occur it was of questionable origin, the fact that the defendant was unable to provide Rodgers with thedate on which his crops had been sold is a factor that could be considered in finding that the defendant disposed of Rodgers's grain knowing that Rodgers would not have authorized the sale. Because destruction of the sales tickets did not eliminate the defendant's obligation to pay Rodgers for his crops (all parties agreed that the weight tickets, which were not destroyed, represented the defendant's obligation to pay) the defendant's statement that the sales tickets had been lost is a suspicious circumstance which the jury could consider on the question of intent. Rodgers admitted that the defendant never denied owing him for his crops. He testified that when he asked for payment the defendant said "don't worry about it; . . . we will work it out. But it never was worked out."
The defendant's failure to comply with the licensing and bonding requirements of the Grain Dealers Act and his transacting business with Rodgers on a price later basis in the fall of 1982 when he had been made aware of the requirements of the Act in the summer of 1982, provide some inference, although slight, of the defendant's intent to deprive Rodgers of his property.
The Grain Dealers Act was designed to protect the farmer in Rodgers's situation. "The purpose of all state grain elevator legislation . . . is to provide protection and security for grain producers to ensure that they receive payment for grain they market." Note, "Dealing with Grain Dealers: The Use ofState Legislation to Avert Grain Elevator Failures,"
68 Iowa L.Rev. 305, 311 (1983) [hereinafter cited as "GrainDealers"]. Thus, the defendant's knowing noncompliance with the Act raises at least an inference that he was unconcerned about protecting the farmers with whom he dealt in price later transactions. Although this inference of "intent to deprive" is somewhat speculative and, standing alone, might not establish that element of the State's case, see Thomas v.State, 363 So.2d 1020, 1022 (Ala.Cr.App. 1978) ("[M]ere speculation, conjecture, or surmise that the accused is guilty of the offense charged does not authorize a conviction."), we believe that, in combination with testimony regarding the defendant's motive for theft, the evidence was sufficient to withstand a motion for judgment of acquittal at the close of the State's case.
The test to be applied in reviewing the sufficiency of circumstantial evidence is not whether the evidence excludes every reasonable hypothesis except that of guilt, but whether a jury might reasonably so conclude. Dolvin v. State,391 So.2d 133, 137-38 (Ala. 1980); Cumbo v. State,368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, Ex parteCumbo, 368 So.2d 877 (Ala. 1978). "[A] jury is under a duty to draw whatever permissible inference it may from the evidence, including circumstantial evidence." Thomas, 363 So.2d at 1022. "Where evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes the leading inquiry." Kelley v. State, 409 So.2d 909, *Page 530 
914 (Ala.Cr.App. 1981); Dolvin v. State, 391 So.2d at 672.
In order to prove motive, the State introduced the testimony of William W. Neighbors, a commodities broker with Thomson-McKinnon Securities in Huntsville, that the defendant had a "hedge" account with Neighbors's trading firm. Neighbors explained that the average speculator in the commodities market is required to put up a 20% "margin," or percentage of the value of the commodities contract in which he is investing. The "hedge," on the other hand, is usually allowed to put up only a 10% margin because the hedge has the actual commodity in his possession. According to Neighbors, the defendant — under the business name of McCord Son Feed and Grain Company — bought and sold soybeans in the commodities market from 1981 through 1983. At the end of 1983, the defendant had a debit account with Thomson-McKinnon in the amount of $10,150.30, with a total loss of $43,461.20 in 1983 trading activities.
The question we must answer is: Was there anyconnection between the defendant's trading losses and his statutorily barred "price later" grain transactions so that the combination of the two provided evidence of criminal intent? "The motive attributed to the accused must havesome legal or logical relation to the act charged according to known rules and principles of human conduct."Spicer v. State, 188 Ala. 9, 65 So. 972, 977 (Ala. 1914) (emphasis added); White v. State, 40 Ala. App. 613, 119 So.2d 344 (1960).
We do not hold, as a matter of law, that there was no connection between the defendant's losses in the grain futures market and his illegal, statutorily prohibited "price later" transactions with Rodgers. At least one commentator has observed that "delayed pricing," such as deferred-pricing and price later contracts, is the major cause of grain elevator failures because it encourages excessive and improvident speculation in futures contracts, which may ultimately lead to the downfall of the elevator operator when the grain market is poor. Grain Dealers, supra at 322-23. See also Geyer, "Prompt and Full Paymentfor Agricultural Commodity Producers," 4 Agric.L.Rev. 247 (1982). If the relationship between futures trading and legitimate "price later" contracts is clear, then the nexus between trading losses and knowingly illegitimate "price later" transactions is enough to make the issue of criminal intent a jury question. Evidence of motive, however inconclusive standing alone, should go to the jury, if it explains othercircumstances tending to show guilt. Harden v. State,211 Ala. 656, 658, 101 So. 442, 444 (1924).
Although the State's evidence of "intent to deprive" was relatively weak, we cannot say, as a matter of law, that it was nonexistent, or that a jury could not have reasonably inferred that the defendant intended to deprive Rodgers of his property.Dolvin, supra; Cumbo, supra.
 V
Section 13A-8-12(b) states that "[t]he burden of injecting the issue of claim of right is on the defendant, but this does not shift the burden of proof." Here, the defendant met his burden of injecting the issue of his honest belief that he "had a claim to the property . . . involved which he was entitled to assert in the manner which forms the basis for the charge against him." Ala. Code, § 13A-8-12(a).
He testified that not only did he honestly believe that title to the crops passed to him at the time of delivery, but also that the custom and usage in the grain industry supported his belief. Danny Gibson, a Cherokee County grain dealer, testified for the defense that a "price later" contract gave the dealer title to the crops and the absolute right to deal with the grain as his own. Two other farmers in the area who had previously dealt with the defendant testified that they knew, when they delivered soybeans to the defendant under a "price later" arrangement, that the beans became the defendant's property. Finally, the defendant introduced a "deferred pricing" contract used by Continental *Page 531 
Grain Company in Guntersville, Alabama, which stated that "All soybeans subject to this policy are the property of Continental in the same manner as a firmly priced purchase transaction. Title to the soybeans shall pass to Continental at the time of delivery."
The defendant having satisfied his burden to raise a jury issue on the question of his claim of right, the State was then required to prove beyond a reasonable doubt that the defendant did not "honestly believe that he had a claim" to the soybeans. Ala. Code (1975), § 13A-8-12(b). See Robersonv. State, 183 Ala. 43, 62 So. 837 (1913). (The prosecution must at all stages prove the elements necessary to constitute the offense charged and overcome pleas of justification or excuse.)
The State met its burden of overcoming the defendant's claim of right defense by proving that as early as 1982 the defendant knew he was not entitled to engage in "price later" grain transactions without being licensed and bonded under the Grain Dealers Act. The defendant's knowing violation of that act defeats his claim of "honest belief" that he was entitled to deal with the soybeans as if title passed to him.
 "Often it is difficult to draw the line between theft and a mere unlawful conversion. If one takes the property of another and converts it to his own use, but takes it in good faith under color of a rightful claim, he is not a thief but an honest wrongdoer, and his liability is civil, not criminal." State v. Holtzclaw, 258 S.W.2d 666, 672 (Mo. 1953) (emphasis added).
The jury was justified in finding that defendant could hardly have had a good faith belief that he was properly claiming title to soybeans delivered under a contract which he knew he was statutorily barred from making.
Construing a claim of right provision similar to §13A-8-12(a), the Maryland Court of Special Appeals observed:
 "The phrase claim of right and the phrase honestly believes himself to be entitled, when applied to an intentional taking of property, must be given a limited and not a broad interpretation. They must be taken to require a legally recognizable right which can be successfully asserted in our courts. The intent to steal, the element of larceny which makes it and robbery special intent crimes, must be evaluated objectively and not subjectively, and within the framework of rights and obligations given and imposed by the law." Cates v. State, 21 Md. App. 363, 320 A.2d 75, 79 (Md.Spec.App. 1974) (emphasis in original).
The defendant's claim of right defense was overcome by the State's evidence of his knowing violation of §§ 2-31-1 et. seq.
 VI
Evidence regarding the defendant's losses in futures trading was unquestionably admissible on the issue of motive. "Testimony going to show motive, though motive is not an element of the burden of proof resting on the State, is always admissible." Mayberry v. State, 419 So.2d 262, 266
(Ala.Cr.App. 1982); Ray v. State, 253 Ala. 329,45 So.2d 4 (Ala. 1950). "[I]n cases of merely peculative crime (such as larceny or embezzlement), . . . the fact that [the defendant] was in need of [money] at the time is decidedly relevant to show a probable desire to obtain it and therefore a probable . . . purloining." 2 Wigmore on Evidence
§ 392 at 432 (Chadbourn rev. 1979).
 VII
Because there was no objection at trial to evidence regarding the value of the property named in the indictment, the defendant has not preserved this issue for review. Objections to evidence cannot be raised for the first time on appeal.Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, Ex parte Gunn, 387 So.2d 283 (Ala. 1980).
AFFIRMED AS TO THE CONVICTION IN CC-85-80 (Rodgers); REVERSED AND RENDERED AS TO THE CONVICTIONS *Page 532 
IN CC-84-224 (Cornelison), CC-84-415 (Lummus), and CC-85-81 (Hereford).
All Judges concur.
[1] The Swinney opinion does not indicate whether or not there was a dispute between the parties as to the meaning of the "storage" contract, or whether the defendant claimed "title" to the soybeans.
[2] The evidence in the record before us indicates that the FmHA very likely did authorize the sale of the crops, since the defendant was notified that he should make checks payable to both the farmer and the FmHA, and the defendant told Hereford that his check would be made jointly payable. "Under present law in most states, no purchaser would buy farm products from and deliver a sole party check to a farmer-seller if the buyer knew the farm products were pledged as collateral under U.C.C. article 9." Geyer, "Proposalsfor Improvements in Agricultural Marketing Transactions or WillFarmers Join the Electronic Age," 29 S.D.L.Rev. 361, 371 (1984). (Emphasis added.)
Although the defendant, as a buyer of crops from a farmer, would not ordinarily take the crops free of an FmHA security interest created by the farmer, see Ala. Code (1975) § 7-9-307(1), and would be liable in conversion to the FmHA for sale of the crops, see United States v. McCleskey Mills,Inc., 409 F.2d 1216 (5th Cir. 1969), the FmHA's security interest in the soybeans would not continue in the proceeds of the sale if the FmHA authorized the sale of the crops in its security agreement with the farmer "or otherwise," see Ala. Code (1975), § 7-9-306(2). See generally, Van Hooser,"Farm Products: Recent Legislative Changes to Section9-307," 29 S.D.L.Rev. 346 (1984); Dolan, "Section9-307(2): The U.C.C.'s Obstacle to Agricultural Commerce in theOpen Market," 72 Nw.U.L.Rev. 706 (1977).